CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

5/31/2023
LAURA A. AUSTIN, CLERK
BY: s/ CARMEN AMOS
          DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

NICHOLAS J. TIERNEY,

*Plaintiff*,

v.

QING LIU, *et al.*,

*Defendants.*

CASE NO. 6:22-cv-00061

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

Nicholas Tierney brings a § 1983 claim against Qing Liu, MD, a jail's medical director, and several jail nurses and correctional officers, asserting they denied, delayed, and withheld medical care while acting under color of state law in violation of his Fourteenth Amendment rights. Dr. Liu, as well as the nurses and officers, move to dismiss the complaint. For the following reasons, Dr. Liu's motion and the motion of officers and nurses named below will be denied. The motion of officers Mike Schmitt, S. Sears, Shaw, and Kraft will be granted.

## Background[1]

In February 2020, Tierney was arrested in Lynchburg, Virginia and initially held at Lynchburg Detention Center ("LDC"). Dkt. 25 ¶¶ 25, 27. There, he disclosed he had previously been treated for skin cancer under his right eye. *Id.* ¶ 27. In early March 2020, a Lynchburg General District Court judge ordered Tierney to be held without bail, and following several motions to continue trial, his case was set for trial in November 2021. *Id.* ¶¶ 30, 32. Shortly after,

---

[1] The following alleged facts are assumed true for purposes of resolving this motion. *See King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016) (reiterating the appropriate standard of review).

1

he was moved to and detained at Amherst County Adult Detention Center (the "jail"). *Id.* ¶ 28. Tierney did not receive a medical intake screening upon arriving at the jail or in the following weeks. *Id.* ¶ 29.[2]

Around late June 2021, Tierney noticed that the skin on his check had hardened. *Id.* ¶ 33. He became concerned because he had been treated for skin cancer on the same area ten years before and asked to be seen by the jail's medical staff. *Id.* His verbal and written requests "for medical help were initially ignored by correctional officers and nurses." *Id.* Tierney asked the jail's nurses for the forms, but they told him they did not any forms and that he should ask the correctional officers. *Id.* ¶ 35. Tierney asked officers Sprouse, Baldonado, Sykes, Hicks, Hayes, Hendricks, Wasman, and Mountjoy, but they told him they did not have any forms in the housing area. *Id.* They also told him to ask the next shift of officers, or they would grab him a form next time they were in the administrative area but "failed to do so." *Id.* This "back-and-forth" to "obtain the forms went on for an unspecified—but anxiety inducing—period of time." *Id.*

After some time, Tierney obtained a medical request form and submitted it to the correctional officers. *Id.* ¶ 36. He was not seen by medical staff, nor did he receive any acknowledgment of the form. *Id.* He and his "fellow inmates believe that some of his written requests for medical care were simply tossed into the trash by correctional officers." *Id.*

Tierney complained to Sprouse about being unable to obtain a medical request form and after Tierney persisted, Sprouse replied "it wasn't [his] fault, and if [Tierney] didn't get away from [Sprouse], [Tierney] would end up with a charge and go to the hole [punitive isolation]," or something similar. *Id.* ¶ 37.

---

[2] The jail's medical and nursing staff are employed by Mediko, Inc., a company contracted to provide medical care at all jails operated by the Blue Ridge Regional Jail Authority. Dkt. 25 ¶ 29.

In late June 2021, Tierney complained about the pain near his eye to Mountjoy, who told him to "put in a request." *Id.* ¶ 38. Tierney explained he had already done so but received no response, to which Mountjoy responded, "that happens." *Id.* Tierney asked if he could obtain a form, to which Mountjoy replied, "I've already given out all of the ones that I brought." *Id.* Tierney asked if he could "call it in" to get more forms because "this [was] serious." *Id.* Mountjoy responded that "I'm not calling that in, and no one would bring it down if I did." *Id.*

In early July 2021, the jail's medical staff received Tierney's medical request form dated July 1, 2021. *Id.* ¶ 39. In that form, Tierney complained that his skin under his right eye had begun to harden and was "becoming painful and discolored." *Id.* He also explained he previously had skin cancer, which resulted in him having skin removed from his face and plastic surgery to close the opening. *Id.* On July 6, 2021, Nurse Manager Tammy Stanley wrote to him, "you will be seen." *Id.* ¶ 40.

In mid-July 2021, Tierney was seen by the jail's medical director, Dr. Liu. *Id.* ¶ 41. Dr. Liu recognized Tierney's condition "could be serious" and informed him that he would need to be seen by a dermatologist. *Id.* ¶¶ 4, 42. On July 15, 2021, Tierney wrote in his journal: "Scared today. Went to the doctor here I have to go to the specialist about my face again. I think it is back (cancer). This time it's [] going to be worse." *Id.* ¶ 43. On that same day, Stanley sent an email to the jail's transportation department stating, "Nicholas Tierney- please schedule a dermatology consult – old (8-9 years ago) skin cancer on face with pain and tightness." *Id.* ¶ 44. A Lynchburg dermatology appointment was scheduled on September 17, 2021. *Id.* ¶ 45. Tierney was not told about the date of his appointment. *Id.*

On July 25, 2021, Tierney wrote in his journal: "My eye is f***** up red as

F*** and swollen." *Id.* ¶ 46. Around mid-to-late July 2021, Tierney was leaving the jail's recreational yard when Lieutenant Phelps stopped him and asked, "who hit you?," to which Tierney replied no one. *Id.* ¶ 47. At that time, the wound on Tierney's face "was opening at an accelerated rate," and he told Phelps he "feared that the hole in his face was a result of cancer that he believed was coming back." *Id.* Phelps told him to put in a medical request form. *Id.* Tierney explained he had but "to no avail." *Id.* Phelps walked away saying there was "nothing" he could do. *Id.*

Toward the end of July 2021, the wound under Tierney's eye was "readily discernible to all who simply looked at" his face. *Id.* ¶ 48. Around that time, Tierney told Witt about his wound while in line for pill call. *Id.* She said she could not do anything "but to wait for the doctor." *Id.* She told him she would give him a band-aid. *Id.*

In early August 2021, Tierney wrote in his journal: "My face hurts and I'm tired of waiting for something to happen with scheduling a visit. This is worse than last time." *Id.* ¶ 49. Around that time, Lieutenant Smith, while conducting rounds, observed Tierney in his cell and asked, "who's hitting you?" *Id.* ¶ 50. Tierney explained no one had hit him and that he needed medical attention for cancer. *Id.* Smith responded that cancer "doesn't do that," or similar words. *Id.* After Tierney again denied that someone had hit him and explained he was "sick" and that "no one was doing anything about it," Smith replied, "that is above my pay grade." *Id.* Over the following weeks, Tierney had similar conversations with Smith. *Id.* ¶ 51. Smith never sought medical input or care for Tierney's wound. *Id.*

In early August 2021, Tierney's face continued to hurt and "the noticeable hole continued to open in his cheek." *Id.* ¶ 52. In August 2021, Tierney wrote in his journal: "My face is in a constant dull to sharp pain." *Id.* ¶ 56. In mid-August 2021, Tierney woke up with the wound

below his right eye bleeding. *Id.* ¶ 59. He asked Sykes for a band-aid to cover the bleeding, to which Sykes responded he didn't have any. *Id.* Tierney asked for him to call a nurse, and Sykes responded that the nurses did not alter their routine and that a nurse would be around for evening pill call. *Id.* Sykes stated that the circumstance "was messed up" but "it is what it is." *Id.* ¶ 60. Sykes never sought medical assistance for Tierney. *Id.* Later that night during pill call, the nurse did not have any bandages for Tierney. *Id.* ¶ 61. Tierney decided to use toilet paper and the sticker on the back of his deodorant to try to cover his wound. *Id.* His wound "visibly bled many times." *Id.* ¶ 62. For medical care, he only received "the occasional band-aid." *Id.*

In September 2021, Tierney asked Hicks to obtain proper healthcare for his wound, which was increasing in size and bleeding profusely at that time. *Id.* ¶ 63. Hicks responded, "if you wanted better healthcare, you should have made better choices" and walked away to complete his rounds. *Id.* Hicks "never took any actions to assist [] Tierney in obtaining medical care." *Id.* Hicks "regularly antagonized" Tierney and often used "the medical neglect of his wound by [the jail] staff as the basis for his barbs." *Id.*

Around mid-September 2021, Tierney had a biopsy of the skin under his right eye, which revealed "nodular" basal cell carcinoma, a type of skin cancer. *Id.* ¶ 64. Around September 2021, Tierney's criminal lawyer argued that Tierney needed immediate care before Lynchburg Circuit Court. *Id.* ¶ 65. The state court directed the parties to obtain an appointment with UVA physicians and explained that Tierney's sister may take Tierney to his appointment if the jail failed to obtain him medical care. *Id.*

Three days later, Stanley sent an email to the jail's transportation department stating, "Nicholas Tierney – please schedule referral to UVA with Dr. Park at UVA Facial Plastic and Reconstructive Surgery for possible recurrent basal cell skin cancer." *Id.* ¶ 66. On that same day,

the transportation department replied: "They are waiting for information from the dermatologist to make a decision whether they will see Tierney while he is incarcerated or wait until he gets released. When they make that decision they will call and inform you and also call me for scheduling if needed." *Id.* ¶ 67.

In October 2021, Hayes observed Tierney's face and stated, "[s]omebody really needs to do something about that." *Id.* ¶ 70. When Tierney asked if he could do anything to help, Hayes responded he "wished that he could, but unfortunately that there was not [anything that he could do]." *Id.* During that month, "Hendricks maliciously made jokes to [] Tierney about the hole in his face." *Id.* ¶ 71. For instance, Hendricks asked Tierney if he wanted to find out "how mace would feel in it?" *Id.* At one point, Tierney called him a "dick," to which Hendricks responded, "I may be a dick, but at least I don't have a hole in my face." *Id.* Hendricks never took any actions to help Tierney. *Id.*

On October 19, 2021, Tierney recorded in his journal: "I woke up at 2:30 AM with my face being in excruciating pain." *Id.* ¶ 73. The next day, Tierney saw Stephen Park, MD, a physician with UVA Facial Plastic and Reconstructive Surgery and Mark Russell, MD, a dermatologist at UVA Medical. *Id.* ¶ 74. They were surprised by the extent of his wound below his right eye, and one remarked "this is not what we were told to expect," or similar words. *Id.* Dr. Park provided that Tierney reported "significant tenderness surrounding lateral cheek and numbness of medial cheek and nose," "some blurry vision and double vision at times," and "sharp pangs of pain occur[ring] at random times." *Id.* ¶ 75.

Around late October 2021, Tierney was moved to medical segregation. *Id.* ¶ 81. In his journal, he wrote that the jail nurses "skipped [his] morning pills" and "still won't give [him] the

antibiotics and painkillers that UVA prescribed." *Id.* On October 25, 2021, Tierney recorded in his journal that "the hole is getting wider and deeper by the day." *Id.* ¶ 83.

On three occasions in late October and early November 2021, Nurse Rucker recorded in Tierney's medical record that his wound had been cleaned, packed with a dry gauze, and sealed with a band-aid. *Id.* ¶¶ 88–90. In November 2021, Tierney noted in his journal, "[f]ace hurts only so bad, hurts on and off, vision goes blurry every so often in my right nostril is always feeling funny and [undiscernible] in the mornings." *Id.* ¶ 96.

On November 15, 2021, Tierney was released on bond. *Id.* ¶ 101. A few days later, Tierney had a CT scan, which revealed that "there was a heterogeneously enhancing mass along the right intro or metal region measuring at least 3.1×2.8×2.8 cm." *Id.* ¶ 102. In December 2021, Tierney was prescribed Oxycodone to help relieve his pain, and he began chemotherapy, which was stopped in April 2021 due to perceived ineffectiveness. *Id.* ¶¶ 104–05. In June 2022, Tierney had surgery to remove his right eye. *Id.* ¶ 106.

In August 2022, Tierney saw Dr. Lee, who explained Tierney "need[ed] to get postoperative radiation therapy to minimize the risk of cancer recurrence." *Id.* ¶ 108. Dr. Lee also drafted a letter, stating "Tierney has a history of skin cancer involving his right cheek. Based on reported medical chart, this lesion was not assessed & treated in a timely fashion while he was incarcerated." *Id.* ¶ 109. Dr. Lee further noted that he "generally recommends skin cancer lesions to be 'treated immediately once diagnosed.'" *Id.* (emphasis removed).

### Legal Standard

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007), with all its allegations taken as true and all reasonable inferences drawn in a plaintiff's favor, *Rubenstein*, 825 F.3d at 212. A motion to dismiss "does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (internal quotation marks omitted). This is not to say Rule 12(b)(6) requires "heightened fact pleading of specifics," instead a plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (providing that "only a complaint that states a plausible claim for relief survives a motion to dismiss").

## Applicable Law

To state a § 1983 claim, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Loftus v. Bobzien*, 848 F.3d 278, 284–85 (4th Cir. 2017) (internal quotation marks omitted). Liability exists only "where it is affirmatively shown that the official charged acted personally in the deprivation of the [plaintiff's] rights." *Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017) (internal quotation marks omitted); *Nash v. Damon*, No. 7:22-cv-00589, 2022 WL 17490079, at *3 (W.D. Va. Dec. 6, 2022) (providing "a § 1983 claim requires factual detail about each defendant's personal involvement"). Thus,

§ 1983 liability cannot be premised on a *respondeat superior* theory. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977).

Under the Fourteenth Amendment, a pretrial detainee "cannot be subject to any form of 'punishment.'" *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021) (quoting *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990)). This prohibition extends to the treatment a pretrial detainee receives and the conditions under which he is confined. "Because adequate medical care is a basic condition of humane confinement," an official's "deliberate indifference to serious medical needs of [pretrial detainees] constitutes the unnecessary and wanton infliction of pain." *Pfaller v. Amonette*, 55 F.4th 436, 445 (4th Cir. 2022) (internal quotation marks omitted) (cleaned up). The Fourth Circuit has "traditionally looked to Eighth Amendment precedents in considering a Fourteenth Amendment claim of deliberate indifference to serious medical needs." *Mays*, 992 F.3d at 300. Thus, to state a Fourteenth Amendment claim of deliberate indifference, a pretrial detainee must show "(1) that the deprivation of a basic human need was *objectively* sufficiently serious, and (2) that *subjectively* the officials acted with a sufficiently culpable state of mind." *De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013) (internal quotation marks omitted) (cleaned up) (emphasis in original).

Under the objective prong, a pretrial detainee must allege that "[a] medical condition is objectively serious when it either is diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."[3] *Mays*, 992 F.3d at 300 (internal quotation marks omitted).

---

[3] Defendants do not contest the objective prong but argue that Tierney has failed to satisfy the subjective prong. *See* Dkts. 32, 34.

The subjective prong has two subparts: (1) "actual knowledge of the risk of harm to the inmate" and (2) recognition "that his actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotation marks removed) (cleaned up); *see Pfaller*, 55 F.4th at 445 (reiterating these two subparts). This standard requires "'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). Rather, deliberate indifference "is most akin to criminal-law recklessness." *Pfaller*, 55 F.4th at 445. An official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

### Dr. Liu's Motion to Dismiss

Dr. Liu moves to dismiss Tierney's claim for failure to allege he acted with deliberate indifference to the setting of Tierney's dermatology appointment.[4] Dkt. 32 at 5–6. He also argues that Tierney's claim fails because he provided Tierney care and was not involved in Tierney's medical care in any way after providing him care in July 2021. *Id.*

First, the allegations reasonably support that Dr. Liu had actual knowledge of Tierney's medical needs and the risk of harm to him. *Iko*, 535 F.3d at 241. In early July 2021, Tierney sent a medical request form explaining that his skin had begun to harden near his eye, that this area was "becoming painful and discolored," and that he previously had skin cancer, which resulted

---

[4] Dr. Liu also argues that Tierney fails to state a supervisory liability claim. Dkt. 32 at 6. However, Tierney is not bringing a supervisory liability claim against Dr. Liu and thus Tierney does not contest that section of his brief. Dkt. 35 at 1, n.1.

in him having skin removed from his face and plastic surgery. Dkt. 25 ¶ 39. Following his request for medical care, Dr. Liu examined Tierney. *Id.* ¶ 42. Based on these allegations, it is reasonable to infer either that Dr. Liu read Tierney's medical request form before seeing him or that Tierney told Dr. Liu about his medical needs during their appointment. *See Bing v. Brivo Systems, LLC*, 959 F.3d 605, 616 (4th Cir. 2020) ("when considering a motion to dismiss, a court must consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff"). As such, Tierney has sufficiently alleged that Dr. Liu knew about Tierney's hardened skin and prior skin cancer. And considering that Dr. Liu recognized this "could be serious," Tierney has also sufficiently alleged that Dr. Liu understood the risk of harm to him. Dkt. 25 ¶ 4.

Second, Tierney has alleged that Dr. Liu recognized his actions were insufficient to mitigate the risk of harm to Tierney arising from his medical needs. *Iko*, 535 F.3d at 241. Jail officials providing "some treatment does not mean they have provided '*constitutionally adequate* treatment.'" *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 211 (4th Cir. 2017) (quoting *De'lonta*, 708 F.3d at 526); *see Stevens v. Holler*, No. 20-7102, 2023 WL 3698543, at *8 (4th Cir. May 30, 2023) (published). While a pretrial detainee "does not enjoy a constitutional right to the treatment of [his] choice, the treatment a [jail] facility does provide must nevertheless be adequate to address the [his] serious medical need." *De'lonta*, 708 F.3d at 526. In *Pfaller*, for example, a prison doctor took "some steps" to treat the prisoner's liver cirrhosis and cancer, "such as ordering hepatitis C genotype testing and prescribing medication to alleviate [the prisoner's] symptoms." 55 F.4th at 451. However, the Fourth Circuit found that the doctor "wasn't off the hook because he prescribed *some* medication" and that a jury might conclude that

11

he acted deliberately indifferent to the prisoner's medial needs for failure to provide adequate treatment. *Id.* at 452 (emphasis in original).

Like *Pfaller*, Dr. Liu took "some steps" to treat Tierney. However, Dr. Lee, who examined Tierney in August 2022, explained he "generally recommends skin cancer lesions to be 'treated immediately once diagnosed.'" Dkt. 25 ¶ 108. Considering Dr. Lee's recommendation, Dr. Liu might have recognized that referring Tierney to a dermatologist without any specification on when such an appointment should occur and failing to schedule a follow-up appointment with Tierney was "insufficient to mitigate the [true] risk of harm" from Tierney's hardening skin, which likely indicated his skin cancer had returned. *Pfaller*, 55 F.4th at 451 (internal quotation marks omitted). Thus, taking all of Tierney's allegations as true and drawing all reasonable inferences in his favor, as the Court must at this stage of the litigation, Tierney has stated a claim against Dr. Lui.

## Nurses and Officers' Motion to Dismiss

### A. Nurse Defendants

Defendants move to dismiss the § 1983 claim against nurse Defendants Witt, Rucker, and Stanley for failure to allege they acted with deliberate indifference. Dkt. 34 at 10–12.

#### 1. Witt & Rucker

Specifically, Defendants argue Tierney's claim against Witt should be dismissed because the allegations do not establish that Witt "knew [Tierney] needed different or more urgent treatment than he was already receiving" and that she was not a cancer specialist doctor who could determine what treatment was appropriate for Tierney. Dkt. 41 at 9. They also argue Tierney's claim against Rucker fails because the allegations support that she "was treating

[Tierney's] wound" and that Tierney was scheduled to receive imaging at UVA only a few weeks after her treatment of Tierney. *Id.* at 9–10.

Contrary to Defendants' arguments, Tierney has sufficiently alleged that Witt and Rucker had "actual knowledge of the risk of harm to" Tierney because they personally saw and treated his wound when it had developed into a hole under his right eye. *Iko*, 535 F.3d at 241 (internal quotation marks removed) (cleaned up). According to the amended complaint, Tierney told Witt about his wound, which was "readily discernible to all who simply looked at" his face. Dkt. 25 ¶ 48. Witt responded that she couldn't do anything but "wait for the doctor" and told him she would give him a band-aid. *Id.* In October 2021, Witt "was supposed to get [Tierney] some band aids" but did not. *Id.* ¶ 72. On three occasions in October and November of 2021, Rucker recorded that Tierney's wound had been cleaned, packed with a dry gauze, and sealed with a band-aid. *Id.* ¶¶ 88–90. In the amended complaint, Tierney included a picture taken around the time Witt and Rucker treated Tierney, which depicts a deep hole under his right eye. *Id.* ¶ 87.

Based on these allegations, it is plausible that Witt and Rucker recognized their actions were insufficient to mitigate the risk of harm to Tierney from his wound and skin cancer. *See Iko*, 535 F.3d at 241. A reasonable jury could conclude that cleaning the wound and giving Tierney a band-aid was not constitutionally adequate treatment. *See Heyer*, 849 F.3d at 211 ("[T]he mere fact that prison officials provide some treatment does not mean they have provided '*constitutionally adequate* treatment.") (internal quotation marks omitted). As such, Tierney's claim against Witt and Rucker will survive the motion to dismiss.

### 2. Stanley

In addition, Defendants argue Tierney's claim against Stanley, the jail's nurse manager, should be dismissed because Stanley only facilitated the scheduling of Tierney's medical

appointments and did not have the expertise to know that a two-month delay between Tierney's appointment with Dr. Liu and his dermatology appointment was too long. Dkt. 34 at 11.

The Court disagrees. Tierney's allegations taken all together support a reasonable inference that Stanley knew about Tierney's wound and prior skin cancer and recognized the risk of harm to Tierney. *See Iko*, 535 F.3d at 241. According to the amended complaint, Stanley scheduled Tierney's visit with Dr. Liu after receiving his medical request form. Dkt. 25 ¶¶ 18, 40. Prior to scheduling his appointment with Dr. Liu, Stanley would have reviewed Tierney's medical request form, which explained he previously had skin cancer and that the skin below his right eye had begun to harden. *Id.* ¶ 39.

Several months after scheduling his appointment with Dr. Liu, Stanley saw Tierney while he was in medical segregation. At that time, the area below Tierney's right eye had developed into an open wound. *Id.* ¶ 80 (Tierney recording in his journal that the jail sent "Stanley hours later for her to tell me that with open wounds and drainage medical segregation is where I am supposed to be . . ."). Despite observing that Tierney's skin had worsened since his appointment with Dr. Liu, Stanley did not take any steps to provide treatment or schedule an immediate medical care appointment for him. *See Miltier*, 896 F.2d at 853 (noting an official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs"); *Cooper v. Dyke*, 814 F.2d 941, 945 (4th Cir. 1987) ("[G]overnment officials who ignore indications that a prisoner's or pretrial detainee's initial medical treatment was inadequate can be liable for deliberate indifference to medical needs."). Thus, Tierney has sufficiently stated a claim against Stanley.

14

## B. Correctional Officer Defendants

Correctional officer Defendants Schmitt, Sears, Smith, Shaw, Kraft, Phelps, Sprouse, Baldonado, Sykes, Hicks, Hayes, Hendricks, Wasman, and Mountjoy move to dismiss Tierney's claim for failure to allege they acted with deliberate indifference. Dkts. 33, 34. Specifically, they argue they were entitled to rely on the medical staff opinions regarding Tierney's proper treatment.[5] Dkt. 34 at 7–8; Dkt. 41 at 4.

### 1. Smith

Tierney has sufficiently alleged that Smith knew about his wound and the risk of harm to him. *See Iko*, 535 F.3d at 241. According to the amended complaint, Smith observed Tierney in his cell and asked, "who's hitting you?" Dkt. 25 ¶ 50. Tierney explained no one had hit him and that he needed medical attention for his cancer. *Id.* Smith responded that cancer "doesn't do that," or similar words. *Id.* After Tierney again denied that someone had hit him and explained he was "sick" and "no one was doing anything about it," Smith replied, "that is above my pay grade." *Id.* Over the following weeks, Tierney had similar conversations with Smith. *Id.* ¶ 51.

Even though Smith had knowledge of the risk of harm to Tierney, he failed to tell a medical official about his worsening condition or seek any medical treatment for him. *See Boley v. Armor Corr. Health Servs., Inc.*, No. 2:21-cv-197, 2022 WL 905219, at *6 (E.D. Va. Mar. 28,

---

[5] Defendants' argument that Tierney is unable to state a claim because the officers were entitled to rely on medical opinions lacks merit. The Fourth Circuit has previously held, at the summary judgment stage, that wardens were "entitled to rely upon their health care providers' expertise." *Miltier*, 896 F.2d at 854. There, however, the record suggested "that the wardens closely monitored [the decedent's] health and ensured that she received medical treatment." *Id.* Unlike *Miltier*, this case is at the 12(b)(6) stage, and the allegations do not support that the officers were closely monitoring Tierney's health or ensuring he received medical treatment. Nor do the allegations support that the officers were relying on medical personnel's expertise when they denied him medical request forms or refused him access to medical care.

2022) ("A correctional officer's refusal to call for medical staff is usually sufficient, at the motion to dismiss stage, to sustain a claim that the officer was personally involved in the denial of treatment or deliberately interfered with treatment.").

The fact that Tierney received some medical care prior to his interactions with Smith does not change this Court's analysis. *See Cooper*, 814 F.2d at 945. For example, in *Caramillo v. Correct Care Sols., LLC*, the district found the allegations sufficient to state a deliberate indifference claim, despite the decedent receiving some medical care, when the jail official defendants disregarded the decedent's requests for treatment when she was vomiting, appeared to have lost weight, and "had a grey or ashen color to her skin." No. 2:19-cv-362, 2020 WL 4747786, at *15 (E.D. Va. Feb. 28, 2020), *report and recommendation adopted*, No. 2:19-cv-362, 2020 WL 2468769 (E.D. Va. May 13, 2020). Likewise, here, Smith disregarded Tierney's requests for medical care and never sought care for him despite observing his wound worsening. Thus, his claim against Smith will survive the motion to dismiss.

### 2. Phelps

For the same reasoning as above, Tierney has sufficiently alleged that Phelps had knowledge of his wound and prior skin cancer. *See Iko*, 535 F.3d at 241. According to the amended complaint, Phelps asked Tierney, "who hit you?" to which Tierney responded no one. *Id.* ¶ 47. At that time, the wound on Tierney face "was opening at an accelerated rate," and he told Phelps that he "feared that the hole in his face was a result of *cancer* that he believed was coming back." *Id.* (emphasis added). Phelps told him to put in medical request form, but Tierney explained he had but "to no avail." *Id.* Despite having knowledge of Tierney's wound and his cancer potentially returning, Phelps failed to take any steps to mitigate the risk of harm to him.

*See Iko*, 535 F.3d at 241; *Boley*, 2022 WL 905219, at *6. Thus, his claim against Phelps will survive the motion to dismiss.

### 3.   Schmitt, Sears, Shaw, & Kraft

Tierney, however, fails to state a claim against Schmitt, Sears, Shaw, or Kraft. In the amended complaint, Tierney alleges that he "was wholly dependent upon [the jail's] staff—including Superintendent Mike Schmitt, Sears, [] Stanley, and Dr. Liu—to send him out for the medical care, but such was not done promptly." Dkt. 25 ¶ 9. He also alleges that Smith, Shaw, Kraft, and Phelps "were aware of [] Tierney's growing wound but failed to afford him access to appropriate medical care" and that when he complained to the "correctional officers and medical staff, including but not limited to, Defendants Stanley, LPN; Witt, LPN; Rucker, LPN, a/k/a "Old Red"; Asst. Site Administrator Sears; Lieutenants Smith, Shaw, Kraft, and Phelps; and correctional officers Sprouse, Baldonado, Sykes, Hicks, Hayes, Hendricks, Wasman, and Mountjoy; they either told him that there was nothing they could do or provided no helpful response." *Id.* ¶¶ 23, 58. The amended complaint contains no other factual allegations about how Schmitt, Sears, Shaw, or Kraft specifically violated his rights.

Therefore, Tierney "makes only collective allegations against" a group of Defendants, "without identifying how" Sears, Schmitt, Shaw, or Kraft "personally interacted with [Tierney] or was responsible for the denial of his [Fourteenth] Amendment rights." *Langford v. Joyner*, 62 F.4th 122, 125 (4th Cir. 2023). And while Sears and Schmitt operated the jail and supervised its personnel, they cannot be held liable for the alleged actions of others they oversaw. Dkt. 25 ¶¶ 21, 22; *Vinnedge*, 550 F.2d at 928 (proving § 1983 liability cannot be premised on *respondeat superior* doctrine.). Thus, Tierney's claim against Schmitt, Sears, Shaw, and Kraft will be dismissed.

### 4.  Sprouse, Baldonado, Sykes, Hicks, Hayes, Hendricks, Wasman, & Mountjoy

Tierney has sufficiently stated a claim against Sprouse, Baldonado, Sykes, Hicks, Hayes, Hendricks, Wasman, and Mountjoy. According to the amended complaint, Tierney discovered the skin under his eye begin to harden in late June 2021, and he asked officers Sprouse, Baldonado, Sykes, Hicks, Hayes, Hendricks, Wasman, and Mountjoy for medical request forms. Dkt. 25 ¶ 35. They told him they did not have any forms in the housing area and to ask the next shift of officers, or they would grab him a form next time they were in the administrative area but "failed to do so." *Id.* He alleges that this "back-and-forth just to obtain the forms went on for an unspecified—but anxiety inducing—period of time." [6] *Id.* At that time, Tierney had not yet seen a doctor, nor had he received any medical care.

The amended complaint contains additional relevant allegations about Sprouse, Mountjoy, Hicks, and Hendricks. Tierney complained to Sprouse about being unable to obtain a medical request form and after Tierney persisted, Sprouse replied "it wasn't [his] fault, and if [Tierney] didn't get away from [Sprouse], [Tierney] would end up with a charge and go to the hole [punitive isolation]," or something similar. *Id.* ¶ 37. In addition, he complained about the pain near his eye to Mountjoy, who told him to "put in a request." *Id.* ¶ 38. Tierney explained he had already done so but received no response, to which Mountjoy responded, "that happens." *Id.* Mountjoy refused to call in additional medical request forms for Tierney. *Id.* He also asked Hicks to obtain proper healthcare for his wound, which was increasing in size and bleeding

---

[6] These allegations are different than the conclusory allegations against Shaw, Craft, Schmitt, and Sears. While these allegations are about a subgroup of Defendants, Tierney provides specific factual detail on how they were personally involved in failing to provide him a medical request form. And considering they all worked as correctional officers and shared similar duties in maintaining the custody of Tierney, it was appropriate for Tierney to allege that they collectively failed to provide him a medical request form. *See* Dkt. 25 ¶ 4.

profusely at that time. *Id.* ¶ 63. Hicks responded, "if you wanted better healthcare, you should have made better choices." *Id.* And Hendricks made jokes about Tierney's wound and never took any actions to assist Tierney despite knowing about his wound. *Id.* ¶ 71.

Taking all his allegations as true, Tierney has sufficiently alleged that Sprouse, Baldonado, Sykes, Hicks, Hayes, Hendricks, Wasman, and Mountjoy had knowledge of Tierney's medical needs and that they intentionally or recklessly refused him access to medical care and that his condition worsened without medical treatment. *Boley*, 2022 WL 905219, at *6 (explaining that courts have found "correctional officers liable in cases where the officers delayed contacting medical staff and that delay resulted in substantial harm").[7]

## Conclusion

For the reasons above, Dr. Liu's motion and the motion of officers and nurses named above will be denied. The motion of officers Schmitt, Sears, Shaw, and Kraft will be granted.

The Clerk of Court is directed to send this Memorandum Opinion to all counsel of record.

Entered this 31st day of May, 2023.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[7] *See, e.g.*, *Dallas v. Craft*, No. 3:21-cv-349, 2022 WL 2079312, at *13 (E.D. Va. June 9, 2022) (finding plaintiff stated a deliberate indifference claim against non-medical officers who knew about the decedent's medical emergency, "failed to provide immediate access to medical care," and "[a]fter an unreasonable amount of time elapsed, [an officer] merely opened the automatic door to permit several inmates to assist the decedent to the medical unit"); *Coats v. Pope*, No. 1:17-cv-2930, 2019 WL 5586871, at *7 (D.S.C. Oct. 30, 2019) (finding plaintiff stated deliberate indifference claim against correctional officers who delayed forty-three minutes in calling for medical assistance where prisoner was "sweating and breathing heavily, vomiting, incapable of speaking, standing or walking, and having seizures").